Present: Carrico, C.J., Compton,[1] Lacy, Hassell, Keenan, Koontz, and Kinser, JJ.

PARDOE & GRAHAM REAL ESTATE, INC.

v.  Record No. 990531   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                                 March 3, 2000
SCHULZ HOMES CORPORATION

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Robert W. Wooldridge, Jr., Judge

In this appeal, we consider whether the statute of frauds barred a real estate brokerage firm from recovering damages for breach of an oral contract for a commission on the sale of a custom home to be constructed on a lot already owned by the home buyer.

Schulz Homes Corporation (Schulz), a residential construction contractor, filed a motion for judgment against Pardoe & Graham Real Estate, Inc. (Pardoe), a real estate brokerage firm.  Schulz alleged that Pardoe intentionally interfered with Schulz's contractual relationship with Lake Manassas Limited Partnership (the developer), and prevented Schulz from constructing homes in the developer's residential subdivision in Prince William County known as Lake Manassas.[2]

_____

[1]Justice Compton participated in the hearing and decision of this case prior to the effective date of his retirement on February 2, 2000.

[2]The claims set forth in Schulz's motion for judgment are not at issue in this appeal.

Pardoe filed a counterclaim against Schulz, alleging that Schulz owed Pardoe a 6% commission, or in the alternative, a 2.5% commission, on Schulz's sale of a custom home to Edward and Paula A. Carlton. Schulz built the home for the Carltons on a lot in Lake Manassas that they had owned for about two years before their home was constructed.

The following evidence was presented in a jury trial. In 1992, Dale K. Schulz, who was president of Schulz, signed a document entitled "Approved Speculative Builder Application and Agreement" (Builder Application). This document set forth the requirements for builders seeking to be "approved" by Lake Manassas' owner to purchase lots and construct homes in the development for sale to the public.[3]

Under Paragraph 5 of the Builder Application, Schulz agreed that when it purchased a lot in Lake Manassas for the purpose of constructing a "speculative" home, Schulz would sign a six-month exclusive listing agreement with the developer's designated sales agent, Pardoe. This paragraph further provided that Schulz would pay Pardoe a 6% commission on the sale of a "speculative" home that Schulz constructed.

---

[3]At the time Schulz signed the "Approved Speculative Builder Application and Agreement," Lake Manassas was owned by D.C. Land Group, Ltd. The developer later succeeded D.C. Land Group, Ltd. as the owner of the project.

Warren B. Watkins, the developer's project director, testified that an amendment to the Builder Application form (Application Amendment) was presented to the approved builders, including Schulz, and discussed at a meeting in November 1993. Under the Application Amendment, Pardoe was entitled to a 2.5% commission when an "approved" builder constructed a custom home on a lot in Lake Manassas already owned by the purchaser of the home. Schulz did not sign the Application Amendment.

In November 1994, Schulz entered into a contract with the Carltons to construct a home on their lot in Lake Manassas. Edward Carlton testified that when he and his wife decided to build a home on their lot, they went to the developer's on-site sales office that was staffed by Pardoe's agent, David Johnson. Johnson directed the Carltons into a room where there were displays containing photographs and descriptions of home models offered by the various "approved" builders. The Carltons solicited bids from three of the "approved" builders and ultimately selected Schulz to construct their custom home.

Johnson testified that at the time Schulz and the Carltons entered into their contract, he spoke with Dale Schulz and indicated that he would send a document entitled "Report of Sale and Commission Earned" to Dale Schulz for his signature. This document contained an acknowledgement that Schulz would pay a 2.5% commission to Pardoe based on the final price of the

Carltons' home.  Johnson testified that Dale Schulz told him that there was "no need" to send the document, since Schulz recognized Johnson as the agent and agreed to "honor the builder's agreement" and to pay the commission.  Since he believed that he had a "good working relationship" with Schulz, Johnson made a notation on the document that he had talked with Dale Schulz and did not obtain his signature.

Contrary to Johnson's testimony, Dale Schulz testified that he never agreed to pay Pardoe a commission on the home Schulz sold to the Carltons.  He also stated that he recalled receiving a document entitled "Report of Sale and Commission Earned," which was prepared by Johnson, but "didn't take any action" after receiving the document.

At the close of the evidence, the jury was instructed, among other things, that a "contract is an agreement, either written or oral, for consideration, between two or more parties."  The jury returned a verdict in favor of Pardoe on its counterclaim against Schulz and awarded Pardoe damages in the amount of $12,088.13, which was equal to 2.5% of the price that the Carltons paid Schulz for construction of their home.

Schulz filed a motion to set aside the jury verdict on the counterclaim on the ground that the statute of frauds barred Pardoe's "claim for a real estate commission."  The trial court issued an opinion letter in which it ruled that Pardoe's

4

counterclaim against Schulz "is a claim for a real estate commission and is subject to § 11-2 of the Code of Virginia (the statute of frauds)." Holding that Schulz had not signed a written document entitling Pardoe to a commission on the Carlton home, the court entered a final order setting aside the jury verdict on the counterclaim and awarding judgment in favor of Schulz on that claim.

On appeal, Pardoe argues that the oral contract on which the jury verdict was based was not an "agreement or contract for services to be performed in the sale of real estate," within the meaning of Code § 11-2(7). Thus, Pardoe contends that the statute of frauds did not bar Pardoe from recovering damages based on that oral agreement to pay Pardoe a commission on the sale to the Carltons. Pardoe also asserts that since this oral agreement was not subject to the statute of frauds, the trial court erred in concluding that the evidence did not support the jury verdict on the counterclaim.

In response, Schulz does not dispute the jury's finding that there was an oral contract but argues that the contract was unenforceable based on the statute of frauds because it related to the sale of a house to be affixed to land. Schulz asserts that in the absence of written documentation of an agreement by Schulz to pay Pardoe a commission on that sale, Code § 11-2(7) barred Pardoe's claim and the evidence was insufficient as a

5

matter of law to support the jury verdict on the counterclaim. We disagree with Schulz's arguments.

The General Assembly codified the statute of frauds in Code § 11-2, which states in relevant part:

> Unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action shall be brought in any of the following cases:
>
> . . . .
>
> 6. Upon any contract for the sale of real estate, or for the lease thereof for more than a year;
>
> 7. Upon any agreement or contract for services to be performed in the sale of real estate by a party defined in § 54.1-2100 or § 54.1-2101;

In applying the language of Code § 11-2(7), we must answer the question whether Pardoe's oral contract with Schulz was an "agreement or contract for services to be performed in the sale of real estate by a party defined in § 54.1-2100 or § 54.1-2101." Id. We first observe that Code § 11-2 does not define the term "real estate." Further, while Code §§ 54.1-2100 and -2101 define the terms "*real estate broker*" and "*real estate salesperson*" in the context of statutory provisions regulating those occupations, the term "*real estate*" also is not defined in Title 54.[4] Therefore, we turn to the general definition of "real

---

[4]The terms "real estate broker" and "real estate salesperson" are not at issue in this appeal.

6

estate" in Code § 1-13.12, which provides in material part: "[T]he words '*real estate*' shall be construed to include lands, tenements and hereditaments, and all rights and appurtenances thereto and interests therein, other than a chattel interest."

The word "tenement" means either an estate or holding of land, or a house or other building used as a residence. Black's Law Dictionary 1480 (7th ed. 1999); see 1 Raleigh Colston Minor & Frederick Deane Goodwin Ribble, The Law of Real Property § 17 (2d ed. 1928). The term "hereditament," in general, signifies any interest in real property that may be inherited by an owner's heirs. See 1 Raleigh Colston Minor & Frederick Deane Goodwin Ribble, The Law of Real Property at § 17; Caroline N. Brown, 4 Corbin on Contracts § 17.1 (rev. ed. 1997).

The words used in Code § 1-13.12 to define the term "real estate" plainly do not encompass a building that is unattached to land. Since construction of the Carlton home had not begun at the time of the oral contract between Pardoe and Schulz, the home was neither an "appurtenance" to land nor a "tenement," within the meaning of the statutory definition. We hold that under the definition of "real estate" in Code § 1-13.12, a "contract for services to be performed in the sale of real estate," as contemplated by Code § 11-2(7), does not include an agreement such as the oral contract between Pardoe and Schulz. Thus, an oral contract providing for a sales commission is not

7

subject to the statute of frauds when that contract is based on the sale of a house to be affixed to land that does not include a contemporaneous sale of the land to which the house will be attached.

Our conclusion is in accord with other authorities that have considered this subject.  Generally, "contracts to erect buildings or other structures upon land are not within the [s]tatute [of frauds], although the structures when completed will be real estate."  9 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 25:15 (4th ed. 1999) (emphasis added); see also Caroline N. Brown, 4 Corbin on Contracts § 17.1 (rev. ed. 1997); Hastings v. Matlock, 171 Cal. App. 3d 826, 836-7 (Cal. Ct. App. 1985); McCaffrey v. Strainer, 439 N.Y.S. 2d 773, 774 (N.Y. App. Div. 1981).  Thus, since Pardoe's counterclaim did not require proof of a writing executed by Schulz obligating it to pay a commission on the sale of a home to the Carltons, we hold that the trial court erred in concluding that the statute of frauds barred Pardoe's recovery of damages under an oral contract.[5]

---

[5]The trial court's final order set aside the jury verdict on the counterclaim "upon the grounds assigned by [Schulz] as being contrary to the law and the evidence in this case and without evidence to support it."  The grounds Schulz raised in the trial court exclusively addressed the issue of the statute of frauds and the absence of any written document containing an agreement by Schulz to pay a real estate commission on the sale of the home to the Carltons.  Schulz did not argue in the trial court

8

For these reasons, we will reverse the trial court's judgment setting aside the jury verdict on the counterclaim and enter final judgment for Pardoe on the counterclaim in accordance with the jury verdict.

                                    Reversed and final judgment.

---

that the evidence was insufficient to support the jury's finding of an oral contract between Pardoe and Schulz and, as noted above, Schulz has not raised this argument on appeal. Thus, we do not address the sufficiency of the evidence apart from our holding above.